# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CD REISS,

       Plaintiff,

v.

AUDIBLE, INC.,

       Defendant.

Case No: 1:24-cv-05923 (JLR) (OTW)

## PLAINTIFF'S MEMORANDUM OF LAW
## IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................1

II.  LEGAL STANDARD ..........................................................................3

III.  ARGUMENT ......................................................................................3

    A.  Audible unlawfully maintains monopoly power through a web of
    anticompetitive conduct. ..............................................................5

        1.  Audible's anticompetitive conduct is enduring in both scope
        and effect. ..........................................................................5

            a.  Audible's anticompetitive conduct goes beyond just locking up
            new releases. ............................................................6

            b.  Audible's foreclosure of new releases is
            both pernicious and permanent. ..............................8

            c.  Audible fails to cite a single case condoning anticompetitive
            conduct of the scope and effect alleged against audible. ................10

        2.  Audible's anticompetitive conduct has harmed
        competition and class. ......................................................15

    B.  Plaintiff and the putative class have antitrust standing to seek redress for the
    injuries inflicted by Audible. ......................................................19

IV.  CONCLUSION ..................................................................................25

## Table of Authorities

**Page(s)**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...................................................................... 22

*Alternative Electrodes, LLC v. Empi, Inc.*,
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) ................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 3

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994) ....................................................................................10

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir.2011) ...........................................................................24, 25

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 2, 3, 4

*CDC Techs., Inc. v. IDEXX Laboratories, Inc.*,
    186 F.3d 74 (2d Cir. 1999) .................................................................................... 13

*CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018) .......................................................................15

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................................3

*Compass, Inc. v. Real Est. Bd. of New York, Inc.*,
    2022 WL 992628 (S.D.N.Y. Mar. 31, 2022) ........................................................ 16

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .......................................................................................5, 6, 15

*Dennis v. JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) ..................................................................22

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*,
    2016 WL 3676686 (S.D.N.Y. July 5, 2016) ...........................................................3

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    598 F. Supp. 2d 394 (S.D.N.Y. 2008) .................................................................. 16

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................................. 23

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013) ....................................................................... 20, 21, 22

*In re EpiPen Mktg., Sales Pracs., & Antitrust Litig.*,
   44 F.4th 959 (10th Cir. 2022) ............................................................................. 13

*Indivior Inc. v. Alvogen Pine Brook LLC*,
   681 F. Supp. 3d 275 (D.N.J. 2023) ..................................................................... 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   638 F. Supp. 3d 227, 253 (E.D.N.Y. 2022) ........................................................ 24

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ................................................................. 16

*John v. Whole Foods Mkt. Grp., Inc.*,
   858 F.3d 732 (2d Cir. 2017) ................................................................................ 21

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ............................................................................................ 24

*LePage's Inc. v. 3M Co.*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................... 11

*Lurenz v. Coca-Cola Co.*,
   2024 WL 2943834 (S.D.N.Y. June 10, 2024) .................................................... 21

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
   302 F.3d 1207 (11th Cir. 2002) .......................................................................... 17

*Mazda v. Carfax, Inc.*,
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ................................................ 11, 15

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ...................................................................... 15, 16

*Meredith Corp. v. SESAC, LLC*,
   2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) .................................................. 17, 18

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984) .............................................................................................. 19

*New York v. Julius Nasso Concrete Corp.*,
    202 F.3d 82 (2d Cir. 2000) .......................................................................... 24

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ...................................................................... 17

*Paddock Pubs.v. Chicago Trib. Co.*,
    103 F.3d 42 (7th Cir. 1996) .......................................................................... 15

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ......................................................................... 13

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................ 10

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ............................................................ 17

*Spinelli v. NFL*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) .............................................................. 10

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011) ........................................................................ 15

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004) .......................................................................... 16

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ..................................................................................... 25

*Tampa Electric Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..................................................................................... 12

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) ....................................................................... 24

*United States v. Dentsply International Inc.*,
    399 F.3d 181 (3d Cir. 2005) .......................................................... 13, 14, 15, 16

*United States v. E.I. du Pont De Nemours & Co.*,
    351 U.S. 377 (1956) ..................................................................................... 16

*United States v. Google LLC*,
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) ................................................... 13

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ........................................................................................... 3

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ........................................................................ 11, 14

*Wiggins v. Unilever United States, Inc.*,
  684 F. Supp. 3d 127 (S.D.N.Y. 2023) ................................................................. 21

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) .......................................................................................... 24

## STATUTES

15 U.S.C. § 15 ........................................................................................................3

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp,
  *Antitrust Law* ¶ 1821d3 (4th ed. 2018) .......................................................11, 16

# I.  INTRODUCTION

Audiobook authors create, edit, produce, and market their works. Yet, Audible takes the lion's share of every audiobook sale—upwards of 75%—for simply electronically transferring audiobooks to listeners' devices. Audible can extract such exorbitant fees because of its monopoly power, which it has obtained and maintained through its anticompetitive conduct, to shutter other avenues of audiobook retail distribution in the United States.

The well-pleaded facts speak for themselves. Audible dominates the distribution, either directly or indirectly, of 82% of all audiobooks sold in the United States. It controls a listener base of over 50 million subscribers. It locks up an astounding 67% of all new releases, 57% of all audiobooks ever written by class members, and over 70% of several popular audiobook categories, such as general fiction, and science fiction & fantasy. Compl. ¶¶ 107-111. It locks up influential authors and popular titles and induces every author class member into 7-year contractual terms to restrict them from distributing through other channels. *Id*. ¶¶ 3, 6-8, 17, 55-57, 84-86, 88-89, 91, 102, 116, 144. And wielding this monopoly power, Audible charges authors exorbitant fees to distribute their works—fees exceeding the marginal cost of distribution by up to 650%. *Id*. ¶ 113.

Plaintiff, for herself and the putative class she represents, seeks to end such exploitation. Rather than targeting the well-pleaded allegations of Plaintiff's complaint, Audible seeks dismissal by attacking a case that Plaintiff did not bring. Contrary to the short-term or temporary restriction it portrays in its motion, Audible's restrictions are neither brief nor limited in scope. With respect to newly released books, the restriction is complete and absolute, renewing with each new release. This "must havedness" window is crucial for authors, and Audible's conduct locks up key content during the most crucial sales period. As a result, Audible's exclusive grip on these new releases deprives competing platforms of the content necessary for them to compete in the marketplace.

1

And Audible's conduct goes much further than new releases. For authors such as Plaintiff and her fellow class members, the 90-day exclusivity is only the beginning of a 7-year contractual term with Audible. When authors distribute their audiobooks through other retailers, Audible imposes penalties for competing—both price-targeted and non-price—to harm the authors. Compl. ¶¶ 3, 6-8, 17, 56-57, 84-86, 88-89, 91, 102, 116, 144. Not surprisingly, more than 57% of their content remains locked up forever. The complaint brought by Plaintiff—which includes 181 paragraphs of well-pleaded allegations—details these allegations and more, including Audible's coopetition arrangement with its nearest competitor, restrictions on consumer switching, and control over the most popular authors and book genres. Together, these allegations more than satisfy *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to state a plausible claim under Section 2 of the Sherman Act.

Not only does Audible posit factual allegations much narrower than those alleged, but it also attacks a legal claim different than the one brought. Audible argues that its self-described conduct is legal under case law addressing claims under Section 1 and the Clayton Act. But that case law is inapplicable because Plaintiff does not allege claims under Section 1 or the Clayton Act. Plaintiff alleges a Section 2 monopolization claim, and Audible fails to cite a single Section 2 monopolization case that condones the conduct at issue here—namely, the foreclosure of competitors and stifling of market competition through anticompetitive conduct, both price targeted and non-price, that further harms the authors.

Finally, Plaintiff and her fellow class members have antitrust standing to bring this suit. As authors, they enter 7-year contracts of adhesion. They suffer price and non-price penalties for distributing through competing channels. And they pay exorbitant fees to distribute their works through Audible. Plaintiff respectfully asks the Court to deny Audible's motion to dismiss.

## II.  LEGAL STANDARD

At the pleading stage, a complaint asserting a monopolization claim under Section 2 of the Sherman Act must allege (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power[,] as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966). A private plaintiff seeking damages must also allege that (3) the monopolization caused "injur[y]." 15 U.S.C. § 15; *Comcast Corp. v. Behrend*, 569 U.S. 27, 43 (2013). Pleading these elements does not require "detailed factual allegations." *Twombly,* 550 U.S. at 555.

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 CIV. 8775 (LGS), 2016 WL 3676686, at *1 (S.D.N.Y. July 5, 2016). The Court need only determine whether the allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). This is *a plausibility* standard, not a *probability* standard: The complaint must simply "raise a right to relief above the speculative level," and a case may proceed "even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 555-556.

## III.  ARGUMENT

Taking Plaintiff's well-pleaded allegations as true, Audible (i) has monopoly power in the market for retail distribution of audiobooks; (ii) has maintained and seeks to maintain its monopoly power through a web of anticompetitive conduct; and (iii) has injured Plaintiff and class members by forcing them to limit their output and pay monopoly prices for retail distribution of their audiobooks.

To justify its motion to dismiss, Audible recasts Plaintiff's complaint as alleging that Audible maintains monopoly power through a narrow scheme involving a narrow window of exclusivity ("90 days") and a narrow number of titles ("ACX titles"). But that is not the complaint Plaintiff filed. Although "detailed factual allegations" are not required, *Twombly,* 550 U.S. at 555, Plaintiff filed a 181-paragraph complaint that alleged, in well-pleaded detail, Audible's web of exclusive distribution deals, coopetition arrangement, subscriber restraints, long-term contracts of adhesion, restrictive exclusivity terms, and retaliatory tactics to curtail competition and maintain its monopoly power. *See* Compl. ¶¶ 3, 6-8, 17, 56-57, 84-86, 88-89, 91, 102, 116, 144. And as Plaintiff also alleges, Audible's conduct has a direct adverse effect on competition by raising prices, lowering overall market activity, reducing innovation, destroying customer choice, and foreclosing rival providers. *Id*. ¶ 145.

Audible's motion, at its core, conflates the second and third elements of a Section 2 monopolization claim. Instead of addressing the alleged web of anticompetitive conduct by which Audible maintains its monopoly power (the second element), Audible disregards those allegations and fixates solely on the allegations of the specific harm that the anticompetitive conduct inflicts on Plaintiff and the putative class members (the third element)—arguing that those specific-harm allegations for element three do not also plausibly establish element two. Properly analyzed, and taking as true Plaintiff's detailed allegations regarding Audible's web of anticompetitive conduct, the Complaint more than plausibly alleges both harm to competition and Plaintiff's standing.

### A.  Audible unlawfully maintains monopoly power through a web of anticompetitive conduct.

Audible's motion tells a tale far removed from the web of anticompetitive conduct described in the complaint. By turning a key competitor into an ally, foreclosing essential market inputs to starve all other competitors, and locking down the consumer base, Audible has shuttered

avenues for competition. Audible's conduct is enduring in both scope and effect, allowing it to obtain and maintain monopoly power in the uncontested market for the retail distribution of audiobooks.[1]

### 1. Audible's anticompetitive conduct is enduring in both scope and effect.

Audible's opening argument both minimizes and mischaracterizes the scope and effect of the alleged anticompetitive conduct. Citing a series of cases suggesting that brief and easily terminable exclusivity agreements are presumptively lawful, Audible argues that one aspect of its challenged conduct relating to new release audiobooks does not harm competition.

There are three fundamental flaws in Audible's argument. *First*, Audible's conduct goes well beyond locking up new releases of author class members and includes alliances with its largest competitor, locking in tens of millions of listener consumers and securing long-lasting exclusivity for entire book genres and catalogs. *Second*, what Audible tries to characterize as "short term" exclusivity with respect to new releases is in reality a permanent and total period of exclusivity for the entire lifecycle of the product. *Finally*, Audible relies on inapposite case law and fails to cite any decision in which a court has dismissed a case involving the character, scope, and effect of the anticompetitive conduct alleged here.

### a. Audible's anticompetitive conduct goes beyond just locking up new releases.

In evaluating an antitrust claim, courts look at the "character and effect" of the totality of a defendant's conduct, which "are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon*

---

[1] Audible does not contest the relevant antitrust market alleged in the complaint: "The relevant product market for purposes of this action is the market for the retail distribution of audiobooks in which retailers compete to provide retail distribution to authors. The relevant geographic market is the United States, and Amazon has monopoly power in the alleged product market." Compl. ¶121.

*Corp.*, 370 U.S. 690, 699 (1962); *see also id.* (noting that an antitrust plaintiff must "be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). Accordingly, Audible's locking up of new releases of author class members must be considered alongside—and not separate from—its web of exclusive distribution deals, coopetition agreements, subscriber customer restraints, long-term contracts of adhesion, restrictive exclusivity terms, and retaliatory tactics.

Audible is the proverbial fox guarding the henhouse. In true fox fashion, Audible brokered an exclusive distribution agreement with Apple, and when that agreement faced antitrust litigation, Audible pivoted to a coopetition detente, absorbing and sidelining Apple into a part of Audible's distribution ecosystem instead of a formidable competitor to it. *See* Compl. ¶¶ 33, 41. Thus, while Audible alone accounts for 63.4% of the market, which itself suffices to exercise monopoly power over Plaintiff and fellow class members, its arrangement with Apple increases its effective share to 81.6% of all audiobooks distributed in the United States. *Id.* ¶ 41-42.

To prevent other audiobook distributors from competing with Audible (and hence providing a competitive check on Audible's prices for distribution services), Audible also locked up large swaths of audiobook content, including the most valuable content. It ties up approximately 67% of all audiobook new releases *from all authors*, not just class members. *See id.* ¶¶ 92-105. New releases are the most in-demand titles sought by consumers and are necessary for retailers to stay competitive, and "Audible deprives its rivals of access to an absolute majority of audiobooks during the all-important 90 days after release." *See id.* ¶¶ 92-105, 109. It is akin to a movie theater chain preventing rivals from showing first-run movies, or a music-streaming service foreclosing access to new hit songs. By foreclosing new-release titles from competing platforms, Audible prevents rivals from offering competitive products, thereby stifling competition and enabling

Audible to charge supra-competitive prices to Plaintiff and other class members, ranging from 60% and 75% of the entire retail price. *See* Compl. ¶¶ 2, 6, 16-17, 148-149.

In addition to tying up new releases, Audible ties up large swaths of book catalog content. Indeed, in the most popular genres, like general fiction, science fiction & fantasy, and sought-after erotica titles, Audible exclusively controls upward of 70% of the content.



Book exclusivity across genres

*See* Compl. ¶ 111 (chart showing book exclusivity across genres). Like the "must-havedness" of new releases, Audible knows that tying up popular categories prevents competing retailers from offering attractive products to consumers.

Audible's conduct goes beyond sheer quantity. Audible strikes deals with influential writers to keep their audiobooks exclusive to Audible. *Id*. ¶ 76. It then locks up other content by preventing competing services from offering certain popular titles as redeemable with membership credits. *Id*. ¶ 78. Audible's "tactics prevent its rivals from developing a competitive collection of audiobooks that would enable them to gain traction in the audiobook space." *Id*. ¶ 116. "As a result, [Audible's] competitors are further deprived of access to a full catalogue of books, and [Audible] maintains the most comprehensive catalogue of audiobooks." *Id*. This harm is to competition itself,

rather than a particular competitor, because "[c]ompetitors systematically cannot challenge [Audible] because they have been deprived of content, and particularly during the time immediately after a book is released, which is crucial for sales." Compl. ¶ 117.

In addition to depriving rivals of content, Audible deprives them of customers. Audible has amassed more than 50 million listener subscribers, who account for 80% of Audible's sales. *Id.* ¶ 65. "Once consumers become Audible subscribers, [it] imposes restrictions that make it inconvenient for consumers to switch or use other services." *Id.* ¶ 79. "For example, while Amazon allows users to transfer eBook files from other services to its Kindle app, [Audible] does not allow users to do the same with audiobook files." *Id.* "These sorts of actions are designed to increase users' switching costs and to deter experimentation with other audiobook retailers." *Id.* & n.14. The upshot of Audible's conduct is to maintain its dominance with consumers in the audiobook space. *Id.* ¶ 80.

### b. Audible's foreclosure of new releases is both pernicious and permanent.

While Audible's anticompetitive conduct is not limited to "short term" or "90 day" exclusivity practices, Audible's foreclosure of new releases cannot be accurately characterized as either short term or temporary. Instead, it is complete and absolute, and it encompasses the entire lifecycle of the newly released audiobook. Compl. ¶ 109 ("Through these new exclusivities, [Audible] deprives its rivals of access to an absolute majority of audiobooks during the all-important first 90 days after release, foreclosing rival platforms from competing with a broad catalogue of recently released titles.") In other words, Audible's exclusive dominance over newly released audiobooks is continuous and perpetual—once audiobooks age out of new-release status, Audible has already secured exclusivity over the distribution of new audiobooks that are entering the market. This exclusivity helps to ensure that other audiobook storefronts cannot effectively

compete with Audible and, in turn, gives Audible the power to reap supracompetitive distribution prices from authors like Plaintiff.

A new release is a distinctive offering from a general book catalog. "The first 90 days stand out as the most critical from a sales perspective, wielding a profound influence on overall success." Compl. ¶ 93. "This period presents a unique opportunity to capitalize on initial excitement, marketing efforts, and consumer engagement." *Id*. "In other words, the 90-day window taps into (1) peak sales windows, (2) marketing campaigns which are usually strongest during this period, (3) the inevitable peak in consumer interest due to the novelty of a release, (4) successful sales momentum by keeping a product relevant and generating more interest, and (5) leveraging the benefits of being a 'New Release' in the market by attracting consumer attention." *Id*.

New releases are the bread and butter of retailers, and no retailer can effectively compete with Audible's level of market foreclosure. Compl. ¶ 118 ("[Audible's] rivals also are consistently missing out on sales for new releases."). And "[w]hen they cannot sell audiobooks that are in high demand, potential customers will opt to purchase from [Audible], rather than any of its competitors"—which, "of course, only continues to increase Audible's (and thus Amazon's) power and influence within the audiobook distribution industry, resulting in more exclusive deals and increasingly restricted access to audiobooks for the rest of the market." *Id*.

New releases command more shelf space and attention for a reason, claiming the highest traction, greatest interest, and most sales to consumers**. Compl. ¶ 93. As the complaint details, during the "must havedness" new release window, consumers who wait years for book releases are filled with a high level of "anticipation and excitement," driving them to purchase new content as soon as it is released. *Id*. at 94. This initial buzz is crucial for boosting sales as eager fans rush to consume it. *Id*.

Authors invest significant resources in marketing campaigns during this critical period to "generat[e] maximum visibility" and create a "sense of urgency" among consumers. Compl. ¶ 95. "The initial release period is when consumer engagement levels are typically at their highest," leading to word-of-mouth recommendations and further organic growth. *Id*. ¶ 97. Additionally, retailers and platforms prioritize new releases in their promotions, featuring prominently in "store displays, recommended lists, and search results," further amplifying sales during this 90-day window. *Id*. ¶ 98. During this period, new content also enjoys its best opportunity to stand out in the market. *Id*. ¶ 99. Positive reviews from critics and early adopters can drive additional momentum during this initial phase, significantly affecting sales. *Id*. ¶ 100. Given that "the first 90 days are the most important for an audiobook's earnings," Audible's exclusive lockup during this period has a "disproportionate and substantial impact on competition," leaving rival distributors unable to make up for the missed opportunity even after the exclusive window opens. *Id*. ¶ 101.

Audible's conduct, even when focusing on new releases, is neither "sharply limited," Mot. at 12, ECF No. 65; nor "a presumptively legitimate business practice." *Id*. at 13.

### c. Audible fails to cite a single case condoning anticompetitive conduct of the scope and effect alleged against audible.

Audible minimizes and mischaracterizes its anticompetitive conduct for a reason: it is trying to plead into inapposite case law about short-term exclusive-dealing contracts. In describing its conduct as something other than what is alleged in the complaint, Audible seeks refuge in case law addressing *Section 1* claims. *See, e.g., Spinelli v. NFL*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (citing, *inter alia*, *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)) (Section 1 case); *Roland Mach. Co.* v. *Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) (Clayton Act case). But Plaintiff does not

plead a claim under Section 1, and Audible fails to cite a single *Section 2* decision condoning the unlawful conduct as actually alleged in the complaint.

Audible's inapposite case law is typified by its reliance on *Mazda*[2] and the proposition stated therein that "exclusive deals covering 'periods of *less than one year*' should presumptively 'be approved, particularly where switching [after one year] appears to face no substantial impediments." *Mazda*, 2016 WL 7231941, at *7. *Mazda*'s "should presumptively []be approved" statement was made in the context of a claim under Section 1, not Section 2. *Id*. For claims brought under Section 1, short-term exclusive deals, especially those under one year with no significant switching barriers,[3] are generally viewed as presumptively lawful because they rarely impose substantial restraints on competition. But that is not true for monopolization claims under Section 2—where even brief exclusivity arrangements can be problematic if they contribute to maintaining monopoly power by foreclosing competition during critical periods, regardless of their duration or ease of termination.[4]

---

[2] *See Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2016 WL 7231941, at *7 (S.D.N.Y. Dec. 9, 2016) (emphasis added) (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 1821 d3), *aff'd sub nom. Maxon Hyundai Mazda*, *supra*.

[3] Of course, class members must distribute through Audible to reach a majority of audiobook listeners and Audible imposes additional significant switching barriers for class members in their 7-year contracts that include the price and non-price penalties if they distribute through Audible's competitors. *See* Section 2 *infra*.

[4] This distinction matters as courts have held that conduct can violate Section 2 even if it does not violate Section 1. *See United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("[W]e agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."); *see also LePage's Inc. v. 3M Co.*, 324 F.3d 141, 158-59 (3d Cir. 2003) (en banc) (holding that exclusive dealing conduct could violate Section 2 even though a jury had concluded that the same conduct did not violate Section 1 of the Sherman Act or Section 3 of the Clayton Act and that exclusive dealing conduct should be considered in the context of all other conduct at issue, and in that context, might be sufficient to support Section 2 liability). Taken together, the exclusionary nature of Audible's practices, coupled with the barriers imposed on competitors, squarely fits within the scope of Section 2 liability.

Here, in the audiobook distribution market dominated by Audible, a short-term exclusive deal that locks out competitors during critical sales periods (such as the first 90-days of a new product's release) has a substantial anticompetitive effect, foreclosing competition. As the Supreme Court cautioned in *Tampa Electric Co. v. Nashville Coal Co.* (a decision on which *Mazda* relies), it is the conduct's "practical effect," and not some arbitrary description of an arrangement, that is critical in assessing whether the conduct substantially forecloses competition. 365 U.S. 320, 327 (1961).

Comparing the "practical effect" of the conduct in *Tampa Electric* with that alleged here proves the point. *Tampa Electric* involved a requirements contract in which a utility company was assured a supply of coal for its generating plants. 365 U.S. at 321. That contract had zero "practical effect" on competition because (1) the seller was not in a dominant position in the market, (2) the competition in the coal industry was not hampered by widespread use of exclusive dealing agreements, and (3) the contract between the coal company and the utility foreclosed only 0.77% of the relevant market. The Court thus found it probable "that performance of the contract will [not] foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327.

The facts here are on the opposite end of the spectrum. Audible controls the distribution of 63.4% of the market and has effectively consolidated Apple's 18.2%, thus consolidating distribution of 81.6% of all audiobooks sold in the United States. *See* Compl. ¶ 41. Audible locks up an astounding 67% of all new releases, 57% of all audiobooks ever written by class members, and over 70% of several popular audiobook categories, such as general fiction and science fiction & fantasy. *See id*. ¶¶ 107-111. Audible unlawfully restrains a listener subscription base of more than 50 million paid subscribers. *See id*. ¶ 65 & n.14. Audible then wields its monopoly power to

charge authors such as the putative class members exorbitant sums to distribute their creations—fees that far exceed the actual cost of distribution by upwards of 650%. *See id*. ¶ 113. And Audible imposes penalties on authors who distribute their books with other retailers. *See id*. ¶¶ 3, 6-8; 17; 56-57; 84-86; 88-89; 91; 102; 116; 144. Audible cites no case in which a court has dismissed a complaint alleging such a web of anticompetitive conduct.[5]

Indeed, cases involving conduct much less pernicious are readily found to state claims for relief under Section 2. For example, in *United States v. Dentsply*, the court held that the dominant manufacturer of artificial teeth in the United States violated Section 2 of the Sherman Act by prohibiting its independent distributors from carrying competing brands of teeth. 399 F.3d at 196. The conduct at issue was not even contractual exclusive dealing but, rather, a unilateral policy that Dentsply would terminate distributors that dealt in competitors' products. *Id*. at 194. Further, the dealers could not continue to carry brands that they carried prior to Dentsply's adoption of the policy. *See id.* at 185. As the court explained, the "test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Id*. at 191. Thus, even though the distributors did not sign written exclusive contracts with Dentsply and despite "the legal ease with which the relationship can be terminated," the dealers had "a strong

---

[5] Audible's other cases cited in its motion to dismiss fare no better. For example, in *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002), the challenged conduct involved a "loyalty" or "conflict of interest" policy, which prohibited distributors who supply Coca-Cola to customers from handling any PepsiCo drink products. Similarly, *CDC Techs., Inc. v. IDEXX Laboratories, Inc.*, 186 F.3d 74, 76 (2d Cir. 1999), concerned a one-year long agreement that prohibited a distributor from marketing a competing product and could be terminated entirely on 60-days' notice. Neither case included allegations of monopolization, let alone conduct that foreclosed competition or led to supracompetitive prices. Likewise, *In re EpiPen Mktg., Sales Pracs., & Antitrust Litig.*, 44 F.4th 959, 974 (10th Cir. 2022), concerned rebate agreements with PBMs, and *United States v. Google LLC*, No. 20-CV-3010 (APM), 2024 WL 3647498, *4 (D.D.C. Aug. 5, 2024), concerned agreements under which Google pays Apple a share of its search-advertising revenue for Apple to permit Google's search engine as the default search option on Apple products. Again, neither case involves the conduct alleged here.

economic incentive to continue carrying Dentsply's teeth" and "the rivals simply could not provide dealers with a comparable economic incentive to switch." *Id*. at 194-195.

Likewise, in *United States v. Microsoft Corp.*, 253 F.3d at 34, the United States challenged Microsoft's exclusive dealing under Section 1 and Section 2. While concluding that the United States did not prove a Section 1 violation the trial court held that the identical conduct violated Section 2, and the D.C. Circuit affirmed. *See id.* at 70. As the court explained, "basic prudential concerns relevant to Section 1 and Section 2 are admittedly the same … [but] we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a [Section 2] violation even though the contracts foreclose less than the roughly 40 percent or 50 percent share usually required in order to establish a [Section 1] violation." *Id*. at 70. The court went on to find that Microsoft's exclusives with internet access providers (IAPs) were unlawful because they "constitute one of the two major channels by which browsers can be distributed" had a "significant effect in preserving [Microsoft's] monopoly." *Id*. at 70-71. Further, the "first wave agreements" with independent software vendors were unlawful even though these vendors constituted a "relatively small channel for browser distribution" because Microsoft already had "largely foreclosed the two primary channels to its rivals." *Id.* at 70-73.

Audible has taken a page from the playbooks of both *Dentsply* and *Microsoft*, combining the most anticompetitive conduct of each to foreclose competition and harm class members.

### 2.    Audible's anticompetitive conduct has harmed competition and class members.

Audible argues that Plaintiff has failed to plead facts demonstrating that class member audiobooks (which Audible terms "exclusive ACX titles") are essential to competition or account for a substantial share of audiobook sales. Mot. at 10, ECF No. 65. According to Audible, Plaintiff's case lacks a plausible story of foreclosure, particularly because many top-selling

audiobooks are produced by major publishers who are not subject to ACX contracts, and the only titles at issue come from self-published authors. *See id*. at 13-14. Audible cites cases involving foreclosure levels under 30 or 40 percent and argues that Plaintiff's allegations do not meet the substantial-foreclosure threshold necessary for a successful claim. *Id*. at 14 (citing *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011), and *Paddock Pubs., Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 44 (7th Cir. 1996)).

But Audible confuses its anticompetitive conduct with the specific harms it inflicts on the author class members. Audible's exclusive dealing toward class members must be considered in the context of the totality of its conduct and its position as a monopolist. *See, e.g., Continental Ore Co.,* 370 U.S. at 699 (courts look at the "character and effect" of the totality of a defendant's conduct, which "are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *Mazda*, 2016 WL 7231941, at *15 (citing *Dentsply*, 399 F.3d at 188-189, 193 (finding anticompetitive effect exists because defendant had a "dominant share" of the market and used that dominance to "effectively choke[] off the market for artificial teeth, leaving only a small sliver for competitors.")); *McWane*, *Inc. v. FTC,* 78 F.3d 814, 837 (11th Cir. 2015) ("[C]ourts have found that a lesser degree of foreclosure is required when the defendant is a monopolist") (citation omitted); *CollegeNet, Inc. v. Common Application, Inc.* 355 F. Supp. 3d 926, 952 (D. Or. 2018) (noting that, under Section 2, "less [foreclosure] might be required" to prove liability than under Section 1).

Audible forecloses 67% of *all* new release audiobooks—the key window in which audiobooks are sold. *See* Compl. ¶¶ 107-111. In conjunction with 67% of new releases, Audible forecloses 57% of all class member works and 70% of general fiction, science fiction & fantasy, and erotica genres, in addition to locking up the most popular individual titles and authors. Because

of the prevalence of the subscription model for consumer audiobook consumption, Audible knows that these levels of foreclosure eliminate the viability of any competitive subscription product in the market.[6] On top of this level of foreclosure, Audible has a listener subscriber base of 50 million people and accounts for the distribution of upwards of 81.6% of all audiobooks sold. *Id.* at ¶ 65.

The cumulative effect of these tactics is not only to substantially foreclose competition in the market but, also, to reinforce Audible's dominance through long-term exclusionary practices. Although "picking the correct [level of foreclosure] is somewhat arbitrary," Areeda & Hovenkamp, supra, ¶ 1821c, at 190, even the cases cited by Audible all raise the alarm at the levels of foreclosure deployed by Audible. *See, e.g.*, *Discover Fin. Servs. v. Visa U.S.A. Inc*., 598 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) ("30 or 40 percent") (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)); *McWane*, 783 F.3d at 837 ("at least 40 %") (citation omitted). It is not a close call.

Indeed, Audible's own conduct toward authors in the putative class unequivocally demonstrates a sufficient level of foreclosure to exercise monopoly power. The Supreme Court defines monopoly power as the "power to control prices or exclude competition." *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956); *see also In re Zinc Antitrust Litig.,* 155 F. Supp. 3d 337, 377 (S.D.N.Y. 2016) ("Market power may be proven directly by evidence of the control of prices or the exclusion of competition."); *Compass, Inc. v. Real Est. Bd. of New York, Inc.*, No. 21-CV-2195 (AJN), 2022 WL 992628, at *4 (S.D.N.Y. Mar. 31, 2022) ("Actual adverse effects on competition can include 'reduced output, decreased quality, and supracompetitive pricing.'").

---

[6] The ease with which the exclusive dealing agreements terminate is irrelevant. Even if the agreement is "at will" it may be illegal. *See Dentsply*, 399 F.3d at 194.

The Court need not guess as to whether Audible has exceeded some requisite level of foreclosure to obtain or maintain monopoly power because the complaint alleges direct evidence of Audible's exercise of monopoly power. Audible wields its monopoly power to charge Plaintiff and other class members fees that are exponentially higher than the marginal cost involved in distributing an audiobook. Such costs are approximately $1.50 to distribute a $15 audiobook—that is, about 10% of its purchase price. Compl. ¶ 113. But Audible charges Plaintiff and other class member authors upwards of 75% of the retail price to distribute their audiobooks. *Id*. ¶¶ 6, 113. This evidence alone demonstrates Audible's exercise of monopoly power. *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 335 (E.D.N.Y. 2009) ("Plaintiff further alleges that defendants have been able to successfully sell their electrodes, which plaintiff claims are inferior to AEL's, at a 600% profit margin. Such an allegation, along with the other allegations in the amended complaint discussed above, supports a plausible claim that there is monopoly power at work in this market.").

Audible's output restrictions and imposition of onerous contractual terms on authors further demonstrate Audible's monopoly power. *See, e.g., Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008) (observing that defendant's market power "flows from its relationship with its consumers" and "the contractual relationship (not any contractual provision) gives [defendant] special access to its consumers, and [defendant] leverages that relationship to gain flex agreements and lease extensions."); *Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207, 1219 (11th Cir. 2002) (recognizing that "a party who exercises contract power may have market power and may violate the antitrust laws"); *Meredith Corp. v. SESAC, LLC*, No. 09 Civ. 9177 (NRB), 2011 WL 856266, at *15 (S.D.N.Y. Mar. 9, 2011) (finding that plaintiffs' sufficiently alleged Section 2 claims by showing that "[defendant's] monopoly power has been maintained or

acquired through the alleged exclusionary conduct" including "prevent[ing] Rightsholders from entering into direct licenses with users and refus[ing] to offer alternatives to the 'all or nothing' blanket license"); *Sidibe v. Sutter Health,* 4 F. Supp. 3d 1160, 1171 (N.D. Cal. 2013) ("[Defendant] uses its market power to impose the all-or-nothing contract provisions.").

Audible requires authors to sign long-term 7-year contracts of adhesion. Compl. ¶ 55. As a "gatekeeper," these contracts are the only way to reach listeners who purchase books on Audible or Amazon. *Id.* ¶¶ 32-33. The contracts limit output by requiring that authors sell their books through only Audible's distribution channels for the first 90 days of their release. *See id.* ¶¶ 56; 77; 92-93; 101; 103; 109. This prohibition on output bars distribution to even libraries and an author's own website. *See id.* ¶¶ 32; 33. Audible then imposes hefty price and non-price penalties on any author who elects to thereafter distribute their audiobooks through other channels, including libraries. *See id.* ¶¶ 6, 8, 17, 56-57, 86, 88-89, 91, 102.

Termed the "Competition Penalty," Audible charges authors 25% higher fees (from 60% to 75%) who elect to distribute their audiobooks on other platforms. *See* Compl. ¶¶ 6, 8, 17, 56-57, 86, 88-89, 91. Beyond just higher fees, Audible imposes non-price penalties on non-exclusive audiobooks, such as reduced visibility on the platform, lower search rankings, and restrictive pricing schemes that discourage purchases. *See id.* ¶¶ 3, 7-8, 17, 56-57, 84-86, 88-89, 91, 116, 144. Non-exclusive audiobooks are not eligible for pre-orders or promotional codes, further suppressing their marketability. *See id.* ¶ 102. What is more, exclusivity is a one-way street: authors are prohibited from converting non-exclusive titles back to exclusive ones, allowing a one-time switch only from exclusive to non-exclusive. *See id.* ¶¶ 56-57.

Because Audible can credibly threaten to all but wipe out an author's earnings, it is able to charge supracompetitive prices to authors, restrict their output, and subject them to onerous

contractual terms. *Id*. ¶ 144. This is the quintessential exercise of monopoly power, and it eliminates any doubt whether Audible has foreclosed an actionable level of competition. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107–08 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.").

Finally, there is no merit to Audible's suggestion that an increase in audiobook production undermines Plaintiff's claim. The complaint alleges that, "[d]espite increased consumer demand and the exponential creation of new audiobooks, overall output has lagged." Compl. ¶ 39. As the complaint further alleges, "many authors have elected not to produce audiobook content notwithstanding consumer demand for such because of the high fees for distribution charged by [Audible]." *Id.* Thus, in the but-for world free of Audible's anticompetitive conduct, output would be higher. *See, e.g.*, *Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 303 (D.N.J. 2023) (explaining that question about "whether prices were higher and output lower than they would have been but for [the defendant's] challenged conduct … is a factual, or contrafactual, dispute that precludes an award of summary judgment to [the defendant].").[7]

**B.    Plaintiff and the putative class have antitrust standing to seek redress for the injuries inflicted by audible.**

Plaintiff and the class of authors she represents are not mere participants in a passive marketplace—they are Audible's direct customers, subject to its anticompetitive conduct. And

---

[7] For similar reasons, Audible's suggestion that Google's 10% market share is in tension with Plaintiff's claims is also unpersuasive. First, Audible's emphasis of this almost proves the point— the largest true competitor (*i.e.*, one that is not party to a coopetition arrangement) commands *only* 10% of the market. Thus, Audible's tactics to control the audiobook retail distribution market have certainly been effective. Second, as detailed above, Audible's ability to maintain supracompetitive distribution prices and to impose them on authors like Plaintiff removes all doubt as to whether Audible has market share sufficient to wield monopoly power. In a but-for world free of Audible's anticompetitive conduct, authors like Plaintiff would have viable options to distribute their audiobooks and would not be forced to pay Audible's monopolistic prices.

because Plaintiff and members of the putative author class suffer direct harm by paying excessive distribution fees to Audible, they have standing to bring suit. Audible has engaged in anticompetitive conduct to maintain its monopoly power to control audiobook distribution in the United States. Audible then exercises this monopoly power to charge monopoly prices to Plaintiff and other author class members to distribute their audiobooks. Plaintiff and the putative class now sue to recover the overcharges they paid Audible. Accordingly, Plaintiff and the putative class easily meet the three-step standard used for determining whether a plaintiff has sufficiently alleged antitrust injury. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

*First*, the complaint "identif[ies] the practice complained of and the reasons such a practice is or might be anticompetitive." *Id*. Plaintiff's 181-paragraph complaint details Audible's web of exclusive distribution deals, coopetition arrangement, subscriber restraints, long-term contracts of adhesion, restrictive exclusivity terms, and retaliatory tactics to curtail competition and maintain monopoly power. *See* Compl. ¶¶ 3, 6-8, 17, 56-57, 84-86, 88-89, 91, 102, 116, 144. This conduct has had a direct adverse effect on competition by raising prices to authors, lowering overall market activity, reducing innovation, and foreclosing rival providers.

*Second*, the complaint "identif[ies] the actual injury the plaintiff alleges." *Gatt Commc'ns*, 711 F.3d at 76. Plaintiff and her fellow class members have had to pay Audible supracompetitive prices to distribute their audiobooks—upwards of 75% of the retail price—even though Audible played no role in the creation, production, or marketing of the audiobook. *See* Compl. ¶ 84. Authors have also had to limit the distribution channels of their works and enter 7-year contracts of adhesion that include a host of penalties that foreclose distribution opportunities, leading to suppressed income and long-term financial harm. These injuries incurred

by Plaintiff and putative class members have placed them "in a worse position as a consequence of the defendant's conduct." *Gatt*, 711 F.3d at 76.

*Third*, the complaint demonstrates how the injury to Plaintiff and putative class members "is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." *Id.* at 76 (internal punctuation and citations omitted). "[N]o one disputes that overpaying for a product results in a financial loss constituting a particularized and concrete injury in fact." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017). Indeed, "the price-premium theory of injury has been broadly accepted in the Second Circuit." *Lurenz v. Coca-Cola Co.*, No. 22-CV-10941 (NSR), 2024 WL 2943834, at *2 (S.D.N.Y. June 10, 2024); *see also Wiggins v. Unilever United States, Inc.*, 684 F. Supp. 3d 127, 141 (S.D.N.Y. 2023) (same; collecting cases).

Despite satisfying the three-part test, Audible suggests that another group of victims (foreclosed audiobook retailers) have been harmed by Audible's anticompetitive conduct. Plaintiff agrees,[8] but Audible is wrong to suggest an either-or situation—*i.e.*, that either Plaintiff is a direct victim or else Audible's competitors are direct victims, but not both Plaintiff *and* Audible's competitors. That is incorrect. As the figure below ("Figure A") demonstrates, there are at least two direct victims of Audible's conduct with distinct and non-overlapping injuries.

---

[8] Having said that, based on the allegations in the complaint and certain dynamics inherent in monopolist-driven markets, it has not been established that non-defendant competitors suffered financial injury from Audible's manipulation of the market, and therefore cannot confirm that those competitors would have standing let alone serve as more efficient enforcers.



As Figure A illustrates, competitors have suffered lost profits in the form of the difference between the competitive price for audiobook distribution and their costs of providing such services. However, authors such as Plaintiff have incurred their own distinct and non-overlapping injuries in the form of the overcharges they have paid to distribute their audiobooks between the but for competitive price and the monopoly-level prices charged by Audible.

Authors such as Plaintiff have paid Audible between 60 and 75% of the retail prices of their audiobooks, which vastly exceeds Audible's marginal costs of approximately 10%. These are overcharges directly paid by Plaintiff and the putative class and they are entitled under the antitrust laws to recover them. *See, e.g.*, *Gatt Commc'ns*, 711 F.3d at 78 ("Directness in the antitrust context means close in the chain in causation") (internal citation and quotation marks omitted); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 60–61 (S.D.N.Y. 2016) (holding that a plaintiff who has been "directly harmed by Defendants' anticompetitive conduct by having to pay higher prices" is an "efficient enforcer"); *Dennis v. JPMorgan Chase & Co.,* 343 F. Supp. 3d 122, 165 (S.D.N.Y. 2018), *adhered to on denial of reconsideration*, No. 16-CV-6496 (LAK), 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) (allegations that plaintiffs' returns were lower because of defendants' anticompetitive conduct "amount to a plausible and

sufficiently direct causal link between plaintiffs' injuries and defendants' alleged misconduct" and holding that "the question of with whom plaintiffs transacted directly is irrelevant.")

*Epic Games, Inc. v. Apple, Inc.* illustrates how standing for author-customers like Plaintiff can coexist with standing for other competitors. There, the court weighed the injury-in-fact requirement under Article III of the United States Constitution and concluded that standing exists for both business customers and competitors. *Epic Games, Inc. v. Apple Inc*., 559 F. Supp. 3d 898, 1052 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023). The court acknowledged that, while Epic is a competitor of Apple because it seeks to open its own distribution services app store, it is also a user (*i.e.*, customer) of Apple's distribution services. *Id*.

So too here. Plaintiff purchases Audible's distribution services and is thus a business customer of Audible, just like Epic Games was a "business customer of Apple's App Store.". Likewise, Plaintiff has been "economically injured because [she] could not distribute [audiobooks] to consumers at lower cost." *Id*. at 1052.

Perhaps recognizing the weakness of its position,[9] Audible resorts to framing the calculation of damages as one of standing. Audible injects conjecture devoid of any factual record to assert that the damages sought by Plaintiff and the putative class are "speculative" and

---

[9] To flesh out whether Audible is legitimately contesting standing or just trying to gin up a way to avoid liability, Audible should specifically identify in its reply brief who it contends would have standing to recover for the monopoly prices it charges to distribute audiobooks. Competitors lack such standing as they have not paid the overcharge. So who would have standing if not Plaintiff and the putative class? If Audible's reply is simply that no one has standing to recover for the supracompetitive prices Audible has charged, then Audible's standing argument quite frankly lacks standing.

"exceptionally complex." Mot. at 16-17, ECF No. 65. [10] These are not standing arguments. The calculation of damages here will be no mystery, especially to antitrust counsel for Audible who are well-versed in the economics behind such calculations. As Figure A above demonstrates, damages may be calculated by the difference between the prices paid to Audible by class members and the but for prices that would have existed in a competitive market without Audible's anticompetitive conduct. This is standard fare for any antitrust economist.

Moreover, the case law affords a plaintiff tremendous leeway in calculating such damages. Indeed, in an antitrust case, once the fact of injury has been established, plaintiffs enjoy a relaxed standard of proof in calculating damages. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 253 (E.D.N.Y. 2022) ("[*Bigelow*] acknowledges the difficulty in comparing real and bit-for profits and makes clear that that difficulty should not preclude plaintiffs' recovery."); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("[C]ourts have allowed antitrust plaintiffs considerable latitude in providing the amount of damages. Proof of amount of damages thus need not conform to a particular theory or model."); *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000) ("[T]he State's burden of proving antitrust damages is not as rigorous as in other types of case."); *Behrend v. Comcast Corp.*, 655 F.3d 182, 203-204 (3d Cir.2011), *rev'd on other grounds*, 569 U.S. 27 (2013) ("Given the inherent difficulty of identifying 'but-for world,' we do not require that

---

[10] Audible assertion of speculative damages is interesting because, rather than limiting a Plaintiff's recovery, an assertion of speculative damages actually expands the time period for which an antitrust plaintiff may seek damages since his or her claim could not have accrued when subject to the defendant's anticompetitive conduct. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190-191 (1997) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339-40 (1971) ("antitrust damages [may be] so 'speculative' or 'unprovable' at the time of a defendant's unlawful act (and plaintiff's initial injury) that to follow the normal accrual rule (starting the limitations period at the point the act first causes injury) would [leave] the plaintiff without relief.")

damages be measured with certainty, but rather that they be demonstrated as 'a matter of just and reasonable inference.'") (quoting S*tory Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

Accordingly, Plaintiff and the class of authors she represents have standing to pursue this claim against Audible.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiff's claims are well-grounded in fact and law, demonstrating the significant harm caused by Audible's conduct and providing a sufficient basis for this case to proceed.

DATED: October 24, 2024

Respectfully submitted,

/s/ *Steve W. Berman*
Steve W. Berman (*pro hac vice*)
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292 | direct
(206) 623-0594 | fax
steve@hbsslaw.com

Phillip F. Cramer (*pro hac vice*)
Dean Balaes (*pro hac vice*)
Sperling & Slater, LLC
1221 Broadway
Nashville, TN 37203
(615) 946-1323 | direct
(312) 641-6492 | fax
pcramer@sperling-law.com
dbalaes@sperling-law.com

Eamon Kelly (*pro hac vice*)
Barry Frett (*pro hac vice*)
Sperling & Slater, LLC
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
(312) 641-3200 | direct
(312) 641-6492 | fax
ekelly@sperling-law.com
bfrett@sperling-law.com

Nathan Emmons (*pro hac vice*)
Hagens Berman Sobol Shapiro LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
(206) 623-7292 | direct
(206) 623-0594 | fax
nathane@hbsslaw.com

*Attorneys for CD Reiss—Plaintiff*

I certify that this memorandum contains 7,828 words, in compliance with Rule 3.C of Judge Jennifer L. Rochon's Individual Rules of Practice in Civil Cases (rev. Jul. 3, 2024).

*/s Steve W. Berman*
Steve W. Berman