UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CD REISS, on behalf of herself and all others similarly situated,<br><br>       Plaintiff,<br><br>   -against-<br><br>AUDIBLE, INC.,<br><br>       Defendant. | Case No. 1:24-cv-05923 (JLR)<br><br>**OPINION AND ORDER** |

JENNIFER L. ROCHON, United States District Judge:

   CD Reiss ("Reiss" or "Plaintiff"), a self-published author of books, including audiobooks, brings this putative class action against Audible ("Defendant"),[1] a subsidiary of Amazon and the largest audiobook retailer globally. At issue is Audible's conduct in the domestic market for audiobook retail distribution. Reiss asserts monopolization and attempted monopolization claims against Audible under section 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 2, on behalf of herself and all persons who contracted with Audible to sell audiobook titles through its platform and paid a distribution fee of at least 60 percent on their audiobook sales. Now before the Court is Audible's motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Dkt. 64 ("Mot."); Dkt. 65 ("Br."). For the following reasons, the motion is DENIED.

---

[1] On September 17, 2024, the Court entered the parties' joint stipulation substituting "Audible, Inc." as the proper defendant in this action. Dkt. 66.

## BACKGROUND

### I.    Factual Background[2]

#### A.    The Parties

Reiss, a best-selling author residing in California, has been self-publishing for more than a decade and started producing audiobooks in 2016.  Dkt. 1 ("Compl.") ¶ 25.  In 2017, she was the recipient of an Audie award.  Compl. ¶ 25.  She has distributed audiobooks through Amazon on both an exclusive and competitive basis since 2020.  Compl. ¶ 25. "Exclusive" distribution means that an author's title is distributed exclusively through Audible's channels, including Amazon, Audible, and iTunes, while "competitive" distribution allows the author to distribute his or her title through both Audible and other distributors. Compl. ¶¶ 83-84.

Reiss brings this action on behalf of a putative class of "authors and rightsholders who contracted with [Audible] to sell audiobook titles through [Audible] and paid a distribution fee of at least 60% on their audiobook sales."  Compl. ¶ 16.  The putative class includes a subclass of "audiobook authors and rightsholders who distribute an audiobook title through channels in addition to [Audible] and who pay [Audible's] 75%+ distribution fee."  Compl. ¶ 17.

Audible is the dominant audiobook retailer in the United States and globally, accounting for over 60 percent of domestic audiobook purchases.  Compl. ¶¶ 1, 40.  Audible's parent company, Amazon, is an "online retail giant" that has made inroads into the audiobook market by providing audiobook retail distribution in exchange for a percentage of the sales

---

[2] Unless otherwise noted, the facts stated herein are taken from the Complaint and accepted as true for purposes of this motion.  *See Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

price paid by consumers.  Compl. ¶¶ 26, 28.  Audible originally launched as an independent

company in 1995, but Amazon purchased the company in 2008 for approximately $300

million.  Compl. ¶¶ 29, 30.

Amazon also owns Audiobook Creation Exchange ("ACX"), an online marketplace

launched by Audible in 2011 for authors, narrators, producers, and other industry

professionals to connect and create audiobooks.  Compl. ¶ 32.  To sell their audiobooks, self-

published and independent authors upload them through ACX, with all titles distributed

through ACX made available for sale on Amazon and Audible.  Compl. ¶ 32.  These

independent authors largely pay for their own production work, including hiring their own

narrators.  Compl. ¶ 51.  In contrast, the "Big 5" book publishers, including HarperCollins,

Macmillan, Hachette, Penguin Random House, and Simon & Schuster, have audiobook

imprints that produce audiobooks, and they contract with Amazon for the distribution of those

audiobooks.  Compl. ¶ 50.  ACX and its contractual terms, as set forth in greater detail below,

therefore apply only to self-published and independent authors, not to authors represented by

the Big 5 publishing houses.

Amazon also has a "classic coopetition alliance" with Apple,[3] whereby audiobooks

uploaded to ACX are automatically made available for retail sale on Apple Books.  Compl. ¶

33.  This agreement allows Audible to leverage the combined 80 percent-plus share of all

audiobook sales when contracting with authors.  *Id.*

---

[3] Coopetition is "the act of cooperating with a competitor."  Compl. ¶ 33 n.4 (citing Barry J.
Nalebuff & Adam M. Brandenburger, *Co-opetition* (1st ed. 1997)).  For years, Amazon and
Apple had an exclusive relationship, with ACX serving as the "exclusive gatekeeper to Apple
Books."  Compl. ¶ 33; *see also* Compl. ¶ 41 n.6.  When that relationship was challenged on
antitrust grounds, Apple opened additional channels and methods for uploading to its
platform, but "retained its *de facto* exclusive relationship with Amazon."  Compl. ¶ 33.

According to Reiss, Audible is a monopolist in the audiobook retail distribution market, and has maintained that monopoly through anticompetitive conduct, in violation of the Sherman Act.  Compl. ¶¶ 18, 28 n.3.

### B.    Audiobook Market Basics and Statistics

The market for audiobook retail distribution has seen "exponential[]" increases in production, with the number of audiobook titles "skyrocket[ing]" between 2010 and 2020 from around 6,000 to more than 70,000.  Compl. ¶ 34.  According to the Audio Publishers Association's annual sales surveys, the market has seen double-digit revenue growth every year for over a decade, bringing the estimated market total in 2022 to $1.8 billion in sales annually.  Compl. ¶ 34.  General fiction and science fiction/fantasy are the largest audiobook categories, with humor, nonfiction, and romance also reflecting strong sales gains in recent years.  Compl. ¶ 38.  Retail distributors like Audible enable audiobooks to reach a wider audience and make authors' works available across various channels and platforms.  Compl. ¶ 58.

Audible is the largest audiobook retailer in the world and accounts for over 60 percent of domestic audiobook purchases.  Compl. ¶ 40.  As of 2023, Audible had more than 50 million paid subscribers (as opposed to those purchasing content "a la carte" or not as part of a subscription), accounting for at least 80 percent of audiobook sales on Audible.  Compl. ¶ 65. New entrants in the audiobook market include Apple Books, which accounts for approximately 20 percent of audiobook sales, and Google Play Books, which accounts for approximately 10 percent of audiobook sales.  Compl. ¶ 41.  Scribd accounts for approximately 4 percent of sales, and an array of smaller retailers — including Audiobooks.com, Spotify, Kobo, Hoopla, Chirp, Libby, Libro.fm, and others — represent the remaining sales.  Compl. ¶ 41.

Notwithstanding "increased consumer demand and the exponential creation of new audiobooks," Reiss maintains that "overall output" in the audiobook market "has lagged." Compl. ¶ 39. According to Reiss, approximately half of the content in the market is tied up by Audible, and Audible has foreclosed consumers from obtaining audiobooks through other channels, such as libraries. Compl. ¶ 39. Reiss further alleges that many authors have elected not to produce audiobook content despite growing consumer demand because of Audible's high distribution fees. Compl. ¶ 39; *see also* Compl. ¶ 11.

### C. Audiobook Industry Structure

ACX facilitates the audiobook production process, including by connecting self-published and independent authors with narrators. *See* Compl. ¶ 32. When independent and self-published authors upload their completed audiobooks to ACX to have them listed for sale on Audible, they must select either exclusive or competitive distribution. Compl. ¶ 54. If authors elect to proceed with exclusive distribution, they are responsible for a distribution fee of at least 60 percent. Compl. ¶ 54. If, however, an author elects to proceed with competitive distribution, they owe Audible a distribution fee of at least 75 percent. Compl. ¶ 54. As Audible characterizes it, authors who select the exclusive route are provided with a 40 percent royalty, while those who select competitive distribution receive a 25 percent royalty. Audible also imposes an "array of other non-price penalties on non-exclusive audiobooks that reduce their visibility and promotional opportunities." Compl. ¶ 7. This includes "degrad[ing] the placement of non-exclusive audiobooks" on Amazon's retail sites, "drop[ping] them in its search rankings," and "subject[ing] them to pricing schemes that dissuade purchases." Compl. ¶ 7. For instance, Audible "does not allow preorders or the distribution of promotional codes for non-exclusive audiobooks." Compl. ¶ 7. Irrespective of the type of distribution they select, self-published and independent authors enter seven-year ACX

Audiobook License and Distribution Agreements with Audible, which renew automatically in one-year increments. Compl. ¶¶ 54-55; *see also* Dkt. 65-1.

Audible allows authors whose titles have been on sale for at least 90 days to convert from exclusive to competitive distribution. Compl. ¶ 56. However, according to Reiss, Audible imposes a 15 percent penalty for transitioning to competitive distribution, increasing the author's distribution fee from 60 to 75 percent (the "Competition Penalty"). Compl. ¶ 56; *see* Compl. ¶ 6. Again, the parties quibble about whether the greater distribution fee for nonexclusive distribution is properly characterized as a "penalty" or just a reduced "royalty payment." *See* Br. at 4. Either way, if an author elects competitive distribution after 90 days of exclusive distribution, they must then pay the competitive distribution fee of 75 percent instead of the exclusive rate of 60 percent; or, as Audible describes it, they would be provided a lower royalty of 25 percent instead of 40 percent. The economic effect is the same regardless of nomenclature. *Cf. United States v. Google LLC*, 747 F. Supp. 3d 1, 151 (D.D.C. 2024) ("Antitrust policy should not differentiate between the manufacturer of widgets that explicitly imposes exclusive dealing on its dealers and the manufacturer that gives such dealers a discount or rebate for dealing exclusively in the manufacturer's widgets, because both have the practical effect of inducing exclusive dealing." (alteration adopted) (citation and internal quotation marks omitted)).

Moreover, Audible's policy is that a switch from exclusive to competitive distribution is permanent: an author cannot revert to exclusive distribution once they have switched to competitive distribution. Compl. ¶ 57. Reiss alleges that this policy "is designed to prevent experimentation, innovation, and a test of competition by discouraging authors from ever distributing on a competitive basis." Compl. ¶ 57.

### D.        Audible's Anticompetitive Conduct

The Complaint alleges that Audible maintains its market dominance through a web of anticompetitive conduct, including but not limited to locking down ACX titles for 90 days, and imposing nonprice- and price-based penalties for competitive distribution.

The Complaint focuses heavily on the 90-day exclusivity period for ACX titles. According to Reiss, "[Audible] traps authors into exclusivity for at least the first 90 days after a title's release," Compl. ¶ 97, with "two-thirds of all recently released audiobooks . . . exclusive to [Audible]," Compl. ¶ 107. Reiss alleges that, given Audible's market dominance, agreeing to 90-day exclusivity is the "only rational economic choice for authors." Compl. ¶ 3; *see also* Compl. ¶ 162. The alternative would be to accept Audible's Competition Penalty and nonprice-based penalties for competitive distribution. Compl. ¶ 162. Reiss alleges that the cumulative effect of the nonprice-based penalties "is to eliminate most sales on Audible," such that "the effective revenue hit" from electing to distribute on a nonexclusive basis "is not merely the 15 percentage points represented by the Competition Penalty; it is most of the revenue from Audible." Compl. ¶ 91.

Moreover, the 90-day window after a book's release "taps into (1) peak sales windows; (2) marketing campaigns which are usually strongest during this period; (3) the inevitable peak in consumer interest due to the novelty of a release; (4) successful sales momentum by keeping a product relevant and generating more interest; and (5) leveraging the benefits of being a 'New Release' in the market by attracting consumer attention." Compl. ¶ 93. As a result, Audible "deprives its rivals of access to an absolute majority of audiobooks during the all-important first 90 days after release, foreclosing rival platforms from competing with a broad catalogue of recently released titles." Compl. ¶ 109.

Reiss alleges that this anticompetitive behavior "fits within [Audible's] broader pattern of anticompetitive conduct with respect to audiobooks," including "(i) complete exclusivity for many titles; (ii) a window of exclusivity on many new releases, when demand for the audiobook is greatest; and (iii) prohibitions on other competing subscription platforms offering certain 'must have' titles as redeemable for credit to their customers."  Compl. ¶ 10. With regards to complete exclusivity, Reiss alleges that Audible also strikes deals with influential writers to keep their audiobooks exclusive to Audible.  Compl. ¶ 76.  Exclusivity during the "critical" 90-day window is also not limited to ACX titles: "[A]pproximately two-thirds of *all* recently released audiobooks are exclusive to Amazon," Compl. ¶ 107 (emphasis added), and Audible "pays some publishers to embargo new releases for 90 days, meaning that for the first three months, the audiobook can only be found on Audible," Compl. ¶ 77. The prevalence of exclusive distribution through Amazon also varies by genre: science fiction/fantasy, erotica, romance, and general fiction feature the largest share of exclusive titles.  Compl. ¶ 111.

As for prohibitions on competing subscription platforms, Audible does not allow competitors to make certain audiobooks, such as the *Harry Potter* franchise, the *Neopolitan Novels* by Elan Ferrante, and *Me and White Supremacy* by Layla F. Saad, redeemable with their membership credits.  Compl. ¶ 78.  Reiss alleges that this "diminish[es] the value of rivals' subscription services," and enables Audible to "capture[] a greater share of the audiobook subscription market."  Compl. ¶ 78.  Audible's restraints also extend to its customers: for instance, Audible does not allow users to transfer audiobook files from other services to its app.  Compl. ¶ 79.  According to Reiss, "[t]hese sorts of actions are designed to increase users' switching costs and to deter experimentation with other audiobook retailers." Compl. ¶ 79.

In addition to the above, "[b]y securing distribution to Apple, [Audible] neuters any effective competitive check that Apple otherwise would provide on the fees it charges authors for retail distribution."  Compl. ¶ 81.

Reiss alleges that the combined effect of the aforementioned conduct is the exclusion of competitors from the audiobook retail distribution market.  According to the Complaint, "[b]ecause rivals cannot offer those titles that are Audible exclusives, they cannot gain a foothold in the market, and therefore they cannot effectively compete with [Audible] on the distribution prices charged to authors."  Compl. ¶ 89.  This effect is "particularly pronounced" for audiobook subscription services, which "depend on having as much content as possible" to minimize monthly customer churn.  Compl. ¶ 90.  Moreover, because of its market dominance, Audible can extract "supracompetitive fees" from authors, Compl. ¶ 4, depressing their total earnings.

## II.    Procedural Background

On June 13, 2024, Reiss commenced this action against Amazon on behalf of herself and the putative class members, asserting claims for monopolization and attempted monopolization under section 2 of the Sherman Act.  *See generally* Compl.  Reiss seeks monetary recovery, including treble damages, in addition to nationwide injunctive relief. Compl. at 38.  On September 16, 2024, Audible filed its motion to dismiss, Dkt. 64, and the next day, the Court entered the parties' joint stipulation to substitute "Amazon.com, Inc." with "Audible, Inc." as the proper defendant in this matter, Dkt. 66 ¶¶ 2-3.  Reiss filed her opposition to Audible's motion to dismiss on October 24, 2024, Dkt. 72, and Audible filed its reply on November 22, 2024, Dkt. 75.  On November 13, 2024, during the pendency of the parties' motion to dismiss briefing, the Court entered a joint stipulation partially staying

discovery in this case pending a decision on Audible's motion to dismiss.  Dkt. 74.  On May

22, 2025, the Court held oral argument on the motion to dismiss.  Dkt. 83 ("Tr.").

## LEGAL STANDARD

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to

monopolize, . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.

"The offense of monopolization has two elements: '(1) the possession of monopoly power in

the relevant market and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident.'"  *United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir.

2001) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  Because the

"mere possession of monopoly power, and the concomitant charging of monopoly prices, is

not only not unlawful," but also "an important element of the free-market system," "the

possession of monopoly power will not be found unlawful unless it is accompanied by an

element of anticompetitive *conduct*."  *Verizon Commc'ns Inc. v. Law Offs. of Curtis V.*

*Trinko, LLP*, 540 US. 398, 407 (2004).  Similarly, "[t]o establish a § 2 violation for attempted

monopolization, a 'plaintiff must prove (1) that the defendant has engaged in predatory or

anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

probability of achieving monopoly power.'"  *Microsoft*, 253 F.3d at 80 (quoting *Spectrum*

*Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  "Both monopolization and attempted

monopolization claims therefore have 'anticompetitive conduct' as one of their elements."

*Mazda v. Carfax, Inc.*, No. 13-cv-02680 (AJN), 2016 WL 7231941, at *15 (S.D.N.Y. Dec. 9,

2016), *aff'd sub nom. Maxon Hyundai Mazda v. Carfax, Inc.*, 726 F. App'x 66 (2d Cir. 2018)

(summary order).

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (*en banc*) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact.  *Id.*  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)).  Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted).

"Antitrust claims in particular must be reviewed carefully at the pleading stage because false condemnation of competitive conduct threatens to 'chill the very conduct the antitrust laws are designed to protect.'"  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (quoting *Verizon Commc'ns Inc.*, 540 U.S. at 414).  "However, 'there are no heightened pleading requirements for antitrust cases,' and 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'"  *Id.* (alteration adopted) (citation omitted) (first quoting *Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, No. 00-cv-05008 (CM) (LMS), 2002 WL 1205740, at *2 (S.D.N.Y. Mar. 15, 2022); and then quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *see also George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) ("In antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976))).

## DISCUSSION

Audible moves to dismiss on two independent grounds.  First, Audible argues that Reiss has not adequately pleaded anticompetitive conduct, as required for both her monopolization and attempted monopolization claims under section 2 of the Sherman Act. Br. at 10-15.  Second, Audible alleges that Reiss lacks antitrust standing because the only "direct victim[s]" of the challenged conduct were Audible's distribution rivals, such as Google and Spotify, not self-published authors like Reiss.  *Id.* at 15-17.  The Court does not agree with either ground for dismissal.

### I.    Reiss Has Adequately Pleaded Anticompetitive Conduct

Reiss alleges that, "[t]hrough an anticompetitive scheme to monopolize the audiobook retail distribution market," including, but not limited to, imposing a 15 percent additional distribution fee for nonexclusive titles, "[Audible] has obtained and is seeking to maintain monopoly power in the audiobook retail distribution market."  Compl. ¶ 169.  For the purposes of this motion to dismiss, Audible does not challenge the Complaint's allegations concerning market definition or Audible's monopoly power.  Br. at 9 n.10.  Instead, Audible's motion to dismiss turns on the second element of a section 2 claim — Audible argues that Reiss has not adequately pleaded that Audible engaged in exclusionary conduct.  *Id.* at 10.

As the D.C. Circuit explained in *United States v. Microsoft Corp.*:

> [T]o be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect."  That is, it must harm the competitive *process* and thereby harm consumers.  In contrast, harm to one or more *competitors* will not suffice.  "The Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."

253 F.3d at 58 (alteration adopted) (quoting *Spectrum Sports*, 506 U.S. at 458).  "A plaintiff bears the burden to show 'that the monopolist's conduct *indeed* has the requisite

anticompetitive effect.'" *Google*, 747 F. Supp. 3d at 152 (quoting *Microsoft*, 253 F.3d at 58-59). "Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188 (3d Cir. 2005).

In assessing whether conduct is exclusionary, courts consider its effect on competitors, its "impact on consumers," and "whether it has impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). "Some 'common' forms of anticompetitive conduct are tying, exclusive dealing, predatory pricing, and defrauding regulators or consumers." *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1170 (10th Cir. 2023) (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013)). However, "[i]t is foundational that alleged anticompetitive conduct must be considered as a whole." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024). "Thus, when a court is faced with allegations of a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories," a firm's exclusionary efforts should "be considered in their totality." *Id.* at 354-55.

As a threshold matter, the Court addresses the parties' dispute about the scope of the anticompetitive conduct alleged. Audible's motion effectively reduces Reiss's 181-paragraph complaint to a single allegation that the ACX contract's 90-day exclusivity period, which applies only to self-published and independent authors, constitutes anticompetitive conduct. *See* Br. at 2-3. But that is not the Complaint before the Court. Reiss alleges a multifaceted scheme to maintain Audible's dominance in the audiobook retail distribution market, of which the 90-day exclusivity period for new releases is just a part. As counsel explained at oral argument, the Complaint alleges at least five categories of anticompetitive conduct:

(1) Audible's tie-up of "must have" books; (2) Audible's coopetition arrangement with Apple, a key competitor; (3) Audible's restrictions on subscribers' ability to use other audiobook services; (4) the 90-day exclusivity period for new releases; and (5) long-lasting exclusivity agreements locking up back catalogues, or non-new releases, and large swaths of entire genres.  Tr. at 32:15-35:8; *see also* Compl. ¶¶ 3, 6-8, 10, 56-57, 75-80, 84-89, 107-109, 111, 116, 144.

Reiss, citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, urges the Court to look at the "'character and effect' of the totality of" Audible's conduct, which is "'not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"  Opp. at 5 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Therefore, Reiss contends, "Audible's locking up of new releases of author class members must be considered alongside — and not separate from — its web of exclusive distribution deals, coopetition agreements, subscriber customer restraints, long-term contracts of adhesion, restrictive exclusivity terms, and retaliatory tactics."  Opp. at 6.  In response, Audible argues that Reiss's "'monopoly broth' theory is legally untenable," because "a 'series of unilateral acts that do not violate the antitrust laws' may not be 'aggregated into an unlawful "course of conduct."'"  Reply at 10 (quoting *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) (summary order)) (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009))).

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, cited by Audible, stands only for the uncontroversial position that two independently lawful acts will not, when combined, constitute an antitrust violation: "the sum of zero and zero is zero."  826 F. Supp. 2d at 710.  But the "proper inquiry" is still whether "qualitatively, there is a 'synergistic effect,'" *City of*

*Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981) (quoting *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 95 n.28 (2d Cir. 1981)); in other words, whether evidence of Audible's exclusionary conduct, viewed holistically, demonstrates an anticompetitive effect such as market foreclosure.  Therefore, the court must still consider Reiss's claims and allegations as a whole to determine whether Reiss has, in fact, adequately pleaded a section 2 claim.  *See, e.g.*, *Cont'l Ore*, 370 U.S. at 699 ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) ("It is the mix of the various ingredients of [a monopolist's] behavior in a monopoly broth that produces the unsavory flavor.").

　　　　Accordingly, because it is the focal point of Audible's motion to dismiss, the Court will turn first to the ACX contract's 90-day exclusivity period.  The Court will then consider the 90-day exclusivity period alongside Reiss's other allegations of anticompetitive conduct — which do not fit neatly into "court-made subcategories . . . of conduct," such as predatory pricing, price-fixing, or exclusive dealing — to determine whether Reiss adequately anticompetitive effect.  *Duke Energy Carolinas,* 111 F.4th at 354.  This aligns with the approach taken by other courts.  *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) ("For the sake of accuracy, precision, and analytical clarity," evaluating "exclusionary conduct separately," and then "evaluat[ing] the evidence in totality to see if any 'synergistic effect' saves [plaintiff's] case."); *Duke Energy Carolinas*, 111 F.4th at 355 ("'[A]ggregation is appropriate' when individual acts are all 'part of the same scheme to perpetuate dominance . . . .'" (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7 (4th and 5th eds. 2024))); *Cont'l Ore*, 370 U.S. at 698-99 (holding that district court's analysis of separately pleaded

anticompetitive conduct as "if they were five completely separate and unrelated lawsuits" was "improper").[4]

## A.    90-Day Exclusivity Agreements

Turning, then, to the 90-day exclusivity provisions in the ACX contracts, "[g]enerally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 270 (3rd Cir. 2012). "Exclusivity need be neither express nor complete to render an agreement 'exclusive' for Section 2 purposes: *De facto* and partial exclusivity may suffice depending on the circumstances." *Google*, 747 F. Supp. 3d at 146 (citing *ZF Meritor*, 696 F.3d at 270, 283). "[E]xclusive agreements are not condemned per se by the antitrust laws, even if they involve a dominant firm." *Id.* at 152. To the contrary, "[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor*, 696 F.3d at 270. "Whether an exclusive dealing arrangement is an 'unreasonable restraint on competition'

---

[4] In *Microsoft Corp*., the D.C. Circuit acknowledged, without deciding the issue, the argument that *Continental Ore*'s instruction that antitrust plaintiffs "should be given the full benefit of their proof" applied only to conspiracies involving collusion between multiple entities, and not to unilateral activity by a single firm. *See Microsoft*, 253 F.3d at 78 ("Microsoft points out that *Continental Ore* and the other cases cited by plaintiffs in support of 'course of conduct' liability all involve conspiracies among multiple firms, not the conduct of a single firm; in that setting the 'course of conduct' is the conspiracy itself, for which all the participants may be held liable."); *see also Am. President Lines, LLC v. Matson, Inc*., --- F. Supp. 3d ---, 2025 WL 870383, at *10 (D.D.C. Mar. 19, 2025) (observing that the "Supreme Court has only ever applied a 'course of conduct' theory in cases involving 'conspiracies among multiple firms,' where the 'course of conduct is the conspiracy itself, for which all participants may be held liable.'" (quoting *Microsoft*, 253 F.3d at 78)). However, at least one Court of Appeals has since applied *Continental Ore's* guidance to ascertain the exclusionary effects of unilateral conduct by a single, dominant firm. *See Duke Energy*, 111 F.4th at 355 ("Just as the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole,' so too must a firm's exclusionary efforts be considered in their totality." (quoting *Cont'l Ore*, 370 U.S. at 698-99) (citing *Grinnell Corp*., 384 U.S. at 576)). Defendants also have not argued that *Continental Ore*'s guidance only applies in conspiracy cases.

depends on whether 'performance of the contract will foreclose competition in a substantial share of the line of commerce affected.'" *EpiPen*, 44 F.4th at 984 (citation omitted) (first quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977); and then quoting *Tampa Elec. Co. v. Nash. Coal Co.*, 365 U.S. 320, 327 (1961)).

"To determine whether the challenged exclusive agreements are likely to foreclose a competitor from the market, courts generally look at (among other things) the duration, ease of terminability, and percentage of the market foreclosed by the contracts." *EpiPen*, 44 F.4th at 986; *see also Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04-cv-08967 (BSJ), 2005 WL 1515399, at *2 (S.D.N.Y. June 23, 2005) ("Courts must therefore conduct a 'broad inquiry,' in order to 'take into account the economic justification for the arrangement.'" (quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc.* 521 F.2d 1230, 1252 (3d Cir. 1975))).

Audible argues that Reiss fails to plead facts necessary to establish two independently necessary elements of an exclusive dealing claim. Br. at 10. Specifically, Audible asserts that (1) because the exclusivity terms are short-term, optional, and terminable, any theory of anticompetitive effect is implausible; and (2) that Reiss has not adequately pleaded that the exclusive ACX titles are "essential inputs" for competition in audiobook distribution. *Id.* at 10-15. The Court addresses these arguments separately.

### 1. Duration of Exclusivity Agreements

As a general matter, courts have held that "exclusive deals covering periods of less than one year should presumptively be approved." *Mazda*, 2016 WL 7231941, at *7 (internal quotation marks omitted); *see also EpiPen*, 44 F.4th at 988-89 ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination.") (collecting cases); *CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*, 186 F.3d 74, 81 (2d Cir. 1999) (finding

"highly significant" the fact that exclusive dealing contracts were "easily terminable on short notice," thereby enabling distributors to "switch allegiance with ease"). But "[d]espite this general presumption against condemning short-term exclusive deals, courts have been careful to note that the length of an exclusive agreement 'is not dispositive of whether it violates [antitrust law],' even if the contract 'is terminable at will.'" *Mazda*, 2016 WL 7231941, at *7 (quoting *Am. Express Travel*, 2005 WL 1515399, at * 6). "[T]he duration of exclusivity appearing on the face of a contract may not tell the whole story if switching to a competitor would prove costly for other reasons." *Id.* at *5.

Recognizing this, courts have held that, when there are substantial costs to transitioning away from a dominant firm's services or goods, even a short-term exclusivity contract can give rise to an antitrust claim. In *United States v. Dentsply International, Inc.*, the Third Circuit held that Dentsply, a manufacturer of artificial teeth, engaged in anticompetitive conduct by requiring distributors not to carry competitors' products, even though Dentsply sold teeth to dealers on an at-will and individual transaction basis. *See* 399 F.3d at 191-96. Notwithstanding the absence of any written exclusivity agreements, let alone one that exceeded a year, the court held that "the economic elements involved" — including "the large share of the market held by Dentsply" — created "a strong economic incentive" for dealers to continue carrying Dentsply's teeth. *Id.* at 193-94; *see also Am. Express Travel*, 2005 WL 1515399, at *7 (declining to dismiss exclusive dealing claim "based on the terminability of the [exclusive dealing agreements]" where "it remain[ed] to be seen whether the [agreements were], in fact, terminable at will"); *Minn. Mining & Mfg Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999) (denying summary judgment on exclusive dealing claim where, among other things, manufacturer's sole-sourcing agreements with distributors included incentives that prolonged exclusivity, the manufacturer had high

market share, and there was a deeply rooted customer preference for the manufacturer's brand of paper). The bottom line in these cases is that courts must look at the "practical effect" of any exclusivity provision when assessing its impact on competition, not just its purported duration or terminability. *Tampa Elec.*, 365 U.S. at 326-27; *see also Minn. Mining & Mfg. Co.*, 35 F. Supp. 2d at 1144 ("When ascertaining the characteristics of an exclusive dealing arrangement, courts look to the 'practical effect' of the agreement, not merely to its form." (quoting *Tampa Elec. Co.*, 365 U.S. at 328)).

Here, Reiss has pleaded that the first 90 days after a book's release are a critical window, such that "Amazon's 90-day lockup of exclusive titles has a disproportionate and substantial impact on competition for authors in the market for audiobook distribution." Compl. ¶ 101. Accepting as true Reiss's allegations and drawing all inferences in her favor — as the Court must at this early stage — the oft-cited justifications for upholding exclusivity agreements, including that "competitor[s] can simply wait for the contracts to expire," *EpiPen*, 44 F.4th at 988, do not readily apply here. "Wait[ing]" for the 90-day exclusivity agreements to expire means missing a sales and marketing window that, according to Reiss, cannot be recovered: "The rival retail distributor who gets access to the newly available audiobook after 90 days is unlikely to ever make up for foregone sales from the first 90 days." Compl. ¶ 101. Moreover, Reiss claims that even after the 90-day period, Audible's Competition Penalty and nonprice penalties make exclusive distribution the only "rational economic choice" for many authors. *See id.* ¶ 162. There is therefore at least a question as to whether the contracts are in fact terminable "at will" after 90 days, or whether, given Audible's market dominance, the transition costs are such that authors do not have a meaningful choice between exclusive and competitive distribution. *See, e.g.*, *Am. Express Travel*, 2005 WL 1515399, at *7 ("The Court agrees that dismissal would be inappropriate

based on the terminability of the [exclusive dealing agreements] because it remains to be seen whether the [exclusive dealing agreements] are, in fact, terminable at will.").  That Reiss and some other self-published authors have distributed audiobooks through Amazon on a competitive basis in some instances, Compl. ¶¶ 25, 107-108, may ultimately undermine Reiss's theory about rational economic choices.  However, given all the facts alleged, and drawing all inferences in Reiss's favor, there is a sufficient basis to proceed to discovery on whether Audible's agreements had the practical effect of extending exclusivity.  Indeed, the vast majority of Audible's cited authorities involve cases in later procedural postures, such as summary judgment.  *See, e.g., PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101 (2d Cir. 2002) (summary judgment); *CDC Techs., Inc*., 186 F.3d 74 (same); *Mazda*, 2016 WL 7231941 (examining anticompetitive conduct on summary judgment after rejecting motion to dismiss section 2 claims based on duration of exclusivity provisions).  At the pleadings stage, a "single factor" such as "the terminability of the agreements" "cannot outweigh all the other factors the Court must consider," which have not yet been fully developed with the benefit of discovery.  *See Am. Express Travel*, 2005 WL 1515399, at *7.

  For the foregoing reasons, the Court finds that the terminability of the ACX contracts alone is not sufficient reason to warrant dismissal of this action.

### 2. Substantial Foreclosure

  Audible's second argument— that is, that Reiss has not adequately pleaded that the ACX titles constitute a significant enough share of overall audiobook sales such that the 90-day exclusivity period forecloses rival distributors from effectively competing — is more persuasive at this stage.

  "Substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr*., 49 F.4th 520, 530 (5th Cir. 2022); *see*

*also Keurig*, 383 F. Supp. 3d at 234 ("To state a Section 2 claim based on exclusive dealing arrangements, a plaintiff 'must allege as a threshold matter a substantial foreclosure of competition in the relevant market.'" (quoting *Com. Data Servers*, 2002 WL 1205740, at *7)). "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply*, 399 F.3d at 191.

Audible argues that Reiss fails to plead any facts showing that exclusive self-published ACX titles occupy a "competitively significant share of overall audiobook sales, such that the challenged exclusivity provisions could possibly keep Audible's rivals from effectively competing in the proposed market for the 'retail distribution of audiobooks.'" Br. at 12 (quoting Compl. ¶ 121). Audible points out that, to the contrary, the "majority of audiobook sales" — including the Dan Browns and J.K. Rowlings of the world — are not subject to the challenged ACX exclusivity provisions. *Id.* at 15; Tr. at 6:8-24; 13:8-19.

Whether the 90-day exclusivity arrangements by themselves foreclose a substantial share of the market is a "close call" — indeed, Reiss's counsel conceded as much at oral argument. Tr. at 37:22-38:3 (acknowledging that if the impact of the ACX contracts were reviewed in a vacuum "that may be a close call," but that *Continental Ore* requires a review of the totality of the conduct); *id.* at 47:12-24 (similar). While Reiss need not plead "precise mathematical allegations" to establish substantial foreclosure at this stage, *Keurig*, 383 F Supp. 3d at 240, she must still "tell a coherent story" about how the 90-day exclusivity period forecloses rival distributors from competing in the audiobook market writ large, *BRFHH Shreveport*, 49 F.4th at 531. The assertion that "substantial market foreclosure" results from contractual provisions that apply only to a subset of the audiobook authors — self-published and independent authors not represented by the major publishing houses — is a hard sell. *See, e.g., Feitelson v. Google, Inc*., 80 F. Supp. 3d 1019, 1032 (N.D. Cal. 2015) (finding that

complaint failed to allege "substantial market foreclosure in the market for general handheld search (which includes all handheld devices such as phones and tablets) . . . based upon the existence of [agreements] that admittedly cover only a subset" of such devices).

Given the generally narrow scope of the 90-day ACX exclusivity provisions, if Reiss's Complaint turned on those provisions alone, the question of market foreclosure would be a thorny one. But this Court need not resolve that question at this juncture, because Reiss's allegations of Audible's exclusionary conduct are not so limited.

### B.    Audible's Other Exclusionary Conduct

As noted above, Audible sidesteps Reiss's allegations of Audible's other exclusionary conduct in the audiobook market. Reiss does not allege that Audible's exclusivity provisions are limited to independent authors' titles. To the contrary, Reiss asserts that "[Audible] strikes deals with influential writers to keep their audiobooks exclusive to Audible," and that it "pays some publishers to embargo new audiobook releases for 90 days," Compl. ¶¶ 76-77. These exclusivity deals result in Audible "t[ying] up large swaths of book catalog content," Opp. at 7, including exclusively controlling upward of 70 percent of the content in the most popular genres, such as general fiction, science fiction, and fantasy, and sought-after erotica titles, *see* Compl. ¶ 111. And, according to Reiss, nearly two thirds of *all* new releases are locked up by Audible for at least 90 days. *See id.* ¶ 107. Beyond Audible's use of exclusivity agreements, Reiss also alleges that Audible constrains its 50 million-plus subscribers' ability to use other services, *id.* ¶ 79, leverages its alliance with Apple to "allocate the market and foreclose effective competition," *id.* ¶¶ 33, 41, and ties-up "must have" titles, preventing rivals from offering them through their subscription plans, *id.* ¶¶ 10, 78.

Although relatively sparse on details, the Court finds that Reiss's allegations, taken together with those pertaining to the 90-day exclusivity period, are sufficient to establish a

"plausible theory" of substantial market foreclosure. *Synergetics USA, Inc. v. Alcon Lab'ys, Inc.*, No. 08-cv-03669 (DLC), 2009 WL 1564113, at *3 (S.D.N.Y. June 4, 2009) (requiring that plaintiff only "identif[y] a plausible theory of impact on a substantial volume of commerce" to survive a motion to dismiss). In assessing the totality of Reiss's allegations, the Court is mindful of the present procedural posture. "[I]t is too early to substantively evaluate each instance of allegedly anticompetitive conduct. . . . What matters at this phase is the presence and plausibility of the allegations — whether the monopoly broth's ingredients are there, not whether they make a meal." *CarePoint Health Sys., Inc. v. RWJ Barnabas Health, Inc.*, No. 22-cv-05421, 2023 WL 7986429, at *7 (D.N.J. Nov. 17, 2023). Again, mathematical precision is not required at this stage; "[t]he extent to which competitors were excluded, and whether it is sufficient to support an antitrust claim, is fact-dependent and not properly disposed of on a motion to dismiss." *Keurig*, 383 F. Supp. 3d at 236. To be sure, if — as Audible argued at oral argument, Tr. at 16:15-17 — Reiss had pleaded the revenue or percentage of listening hours attributable to the 67 percent of new release titles Audible allegedly locks down, that would have been a more meaningful measure of market foreclosure. But for purposes of notice pleading under the Federal Rules of Civil Procedure, Reiss has done enough.

Aggregating the harms resulting from each of Audible's categories of exclusionary conduct to determine whether Reiss has pleaded a plausible theory of substantial market foreclosure is also appropriate. Indeed, the D.C. Circuit took this approach in *Microsoft*. There, the court found that Microsoft's deals with independent software vendors ("ISVs") requiring prioritization of Microsoft's Internet Explorer browser were anticompetitive, even though ISVs were a "relatively small channel for browser distribution." 253 F.3d at 72. The D.C. Circuit found that the ISVs took on "greater significance because . . . Microsoft had

largely foreclosed the two primary channels to its rivals." *Id.* Just as the foreclosure resulting from Microsoft's dealings with ISVs was substantial only when viewed alongside Microsoft's other exclusionary conduct, the alleged 90-day exclusivity periods "take on greater significance" when viewed alongside Audible's alleged subscriber restraints, long-term exclusivity deals, and coopetition alliance with a key competitor. *See also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together"). Reiss may well have difficulty proving substantial market foreclosure down the road. But, for the purposes of surviving Audible's motion to dismiss, Reiss has met her burden of pleading a plausible theory thereof.[5]

For the foregoing reasons, the Court finds that Reiss has adequately pleaded substantial market foreclosure and therefore denies Audible's motion to dismiss the Complaint on that ground.

### C.    Audible's Remaining Arguments Regarding Anticompetitive Effect

Audible separately argues that the Complaint's allegations regarding output and new market entrants undermine Reiss's theory of liability. Pointing to Reiss's allegations regarding the increased production of audiobooks and double-digit revenue growth in the audiobook market, Audible argues that "[s]uch output increases are quintessential evidence of a healthy and competitive market, not — as the Complaint alleges — a monopolistic one."

---

[5] Audible's citation to cases discussing substantial foreclosure as a pleading requirement do not compel a different result. *Nirvana, Inc. v. Nestle Waters North America, Inc.* dismissed plaintiff's exclusive dealing agreement because plaintiff failed to sufficiently plead a product market and geographic market, not because plaintiff failed to sufficiently plead substantial foreclosure of competition in the relevant market. 123 F. Supp. 3d 357, 377-78 (N.D.N.Y. Aug. 10, 2015). *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation* rejected attempts to dismiss exclusive dealing claims based on a failure to allege substantial foreclosure, underscoring that "precise mathematical allegations are not required at the pleading stage" and that "substantial foreclosure . . . does not require a complete lack of growth to sustain a Section 2 claim." 383 F. Supp. 3d at 235; *see also id.* at 235-40.

Br. at 5.  This argument is unavailing.  Reiss also alleges that "overall output has lagged," including because "many authors have elected not to produce audiobook content notwithstanding consumer demand for such because of the high fees for distribution charged by [Audible]."  Compl. ¶ 39.  There is no inconsistency between these assertions: Reiss maintains that, but for Audible's anticompetitive conduct, output in the audiobook market would have been greater.  Whether that is in fact the case is a "factual, or contrafactual, dispute" not properly resolved on a motion to dismiss.  *See, e.g.*, *Invidior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 303 (D.N.J. 2023) (holding that question as to whether prices were higher and output lower than they would have been but for the counterclaim-defendant's challenged conduct was a "factual, or contrafactual, dispute that preclude[d] an award of summary judgment").

Audible's assertion that the presence of new market entrants, such as Apple and Google, evidences a healthy and competitive market is likewise unconvincing.  Br. at 10.  "Under [section 2] of the Sherman Act, it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *Dentsply*, 399 F.3d at 191.  That the next-largest competitor in the market holds 10 percent of market share does not undermine Reiss's assertions of anticompetitive conduct.  Google's market share pales in comparison to the combined 80 percent share Audible effectively controls through its coopetition alliance with Apple.  Compl. ¶ 33; *see also Invidior*, 681 F. Supp. 3d at 302 (observing that the "more appropriate inquiry is not whether [a competitor] gained some degree of market share, but rather whether it gained significantly less share 'than it likely would have absent the challenged conduct'" (alteration adopted) (quoting *McWane , Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015))); *McWane*, 783 F.3d 830-32 (presence of

competitor did not undermine finding of monopoly power where competitor's market share "remained below 10%" and "had no effect on [defendant's] prices").

For all of these reasons, the Court denies Audible's motion to dismiss the Complaint for a failure to adequately allege anticompetitive conduct.

## II.    Antitrust Standing

The Court next turns to Audible's second argument that Reiss lacks antitrust standing to bring her section 2 claims.  Br. at 15-17.  The Court disagrees.

"[A]lthough Section 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436-37 (2d Cir. 2005) (footnote omitted) (quoting *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).  "Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement," the Court "must dismiss it as a matter of law."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (alteration adopted) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).  To establish antitrust standing, an antitrust plaintiff must show "injury of the type the antitrust laws were intended to prevent and that flows from what which makes defendants' acts unlawful," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo-Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)), and be "an 'efficient enforcer' of the antitrust laws," *Gatt*, 711 F.3d at 78.

### A.    Antitrust Injury

"Courts in this circuit employ a three-step analysis to determine whether a plaintiff has plausibly alleged antitrust injury," *Keurig*, 383 F. Supp. 3d at 220 (citing *Gatt*, 711 F.3d at 76):

> First, the plaintiff must identify the practice complained of and the reasons the practice is or might be anticompetitive.  Second, the court must identify the actual injury alleged by the plaintiff.  Third, the court must compare the anticompetitive effect of the practice at issue to the actual injury alleged by the plaintiff.

*Id*. (citations omitted) (citing *Gatt*, 711 F.3d at 76).  "It is not enough for the actual injury to be 'causally linked' to the asserted violation."  *Gatt*, 711 F.3d at 76 (quoting *Brunswick*, 429 U.S. at 489).  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

For the reasons set forth above, Reiss has sufficiently identified the practices complained of and the reasons the practices are or might be anticompetitive.  Moreover, Reiss alleges that she and the class of authors she represents are "Audible's direct customers, subject to its anticompetitive conduct," including its "excessive distribution fees."  Opp. at 19-20.  Reiss's alleged overcharge injury "plainly is 'of the type the antitrust laws were intended to prevent.'"  *Keurig*, 383 F. Supp. 3d at 221-22 (quoting *Brunswick*, 429 U.S. at 489) (holding that direct purchasers of defendant's product suffered antitrust injury by virtue of having to pay supracompetitive prices due to defendant's anticompetitive conduct).  Indeed, "the prototypical example of antitrust injury is an allegation by consumers that they have had to pay higher prices . . . as a result of a defendant's anticompetitive conduct." *Mathias v. Daily News, L.P.,* 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001); *see also DNAML Pty, Ltd. v. Apple, Inc*., 25 F. Supp. 3d 422, 427 (S.D.N.Y. 2014) ("As the Supreme Court has

explained . . . 'Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices.'" (quoting *Assoc. Gen. Contractors of Calif.*, 459 U.S at 530); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) ("Generally, when consumers . . . must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" (quoting *Brunswick*, 429 U.S. at 489)).   Thus, Reiss has sufficiently pleaded antitrust injury.

## B.    Efficient Enforcer of Antitrust Laws

Audible's arguments center on the second requirement for antitrust standing — that the plaintiff be an efficient enforcer of the antitrust laws.  Tr. at 74:12-13 (acknowledging that Audible's brief focused on the efficient enforcer factors "almost exclusively").   "The Second Circuit has identified four factors to determine whether a plaintiff is an 'efficient enforcer'":

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 107 (S.D.N.Y. 2015) (quoting *Gatt*, 711 F.3d at 78).  "These four factors need not be given equal weight," and "the relative significance of each factor will depend on the circumstances of the particular case."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019) (citation omitted).

"Directness in the antitrust context means close in the chain of causation."  *Gatt*, 711 F.3d at 78 (quoting *Int'l Bus. Machs. Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)).  Reiss has adequately pleaded a direct relationship between her and the class members' alleged injury — the overcharge of distribution fees — and Audible's

conduct. Specifically, Reiss alleges that Audible's supracompetitive distribution fees result from its anticompetitive tactics, including, but not limited to, its imposition of a Competition Penalty and other nonprice penalties on authors who elect to distribute with other retailers. Compl. ¶¶ 1-4, 116-119; *see also DDAVP*, 585 F.3d at 688 (holding that consumer's derivative harm was sufficiently direct where "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices"). Moreover, Reiss is a direct purchaser of Audible services, and thus pays the alleged overcharge directly to Audible. *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2023 WL 6006525, at *14 (S.D.N.Y. July 31, 2023) (holding that the "direct relationship between [the plaintiffs'] injury and Amazon's conduct is further supported by the finding that [p]laintiffs are direct purchasers from Amazon, and thus paid the alleged overcharge directly to Amazon"), *report and recommendation adopted*, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024). There is therefore "no 'intermediary in the distribution chain' between the [authors], who paid the overcharge,'" and Audible, "who is alleged to have caused the overcharge," *id.* (quoting *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019)).

"The second factor asks 'whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation.'" *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *15 (quoting *Gelboim*, 823 F3d at 772). Audible argues that its rival distributors are such a class. Br. at 16. *In re Amazon.com, Inc. eBook Antitrust Litigation*, 2023 WL 6006525, rejected a similar standing argument. In that case, eBook consumers sued Amazon and major book publishers for antitrust violations. The court observed that even if Amazon's retail competitors were "better positioned to sue for an antitrust violation," the efficient enforcer test "does not ask whether [p]laintiffs are '*the* entity most motivated by self-interest.'" *Id.* (quoting *DDAVP*, 585 F.3d at 688-89). Rather, "[t]he

second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws." *DDAVP*, 585 F.3d at 689.  Reiss and the putative class members, as authors subjected to allegedly supracompetitive distribution fees — an injury separate and distinct from the lost profits suffered by Audible's rivals — fall within that category.  *See In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *15 ("[E]ven if Amazon's retail competitors ha[d] a claim for lost profits, [p]laintiffs . . . [sought] overcharge damages, which is a 'wholly distinct' category of damages." (quoting *DNAML*, 25 F. Supp. 3d at 431)); *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 60-61 (S.D.N.Y. 2016) (holding that purchasers who "allege[d] being forced to pay supra-competitive prices as a result of [d]efendants' anticompetitive conduct" were efficient enforcers) (alteration adopted) (citation omitted)).

As for the third factor, "a high degree of speculation in a damages calculation suggests that 'a given plaintiff is an inefficient engine of enforcement.'"  *IQ Dental Supply, Inc.*, 924 F.3d at 66-67 (quoting *Gelboim*, 823 F.3d at 779).  Reiss argues that damages can be calculated "by the difference between the prices paid to Audible by class members and the but for prices that would have existed in a competitive market without Audible's anticompetitive conduct."  Opp. at 24.  Calculation of such overcharge payments is, as Reiss notes, standard fare for antitrust litigation.  *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *16 (holding that eBook consumers, who alleged an overcharge injury based on Amazon's transaction fees, "adequately pled that they suffered non-speculative damages").  The fact that Reiss opted into exclusivity for at least some of her titles and earned substantially higher royalties as a result does not, as Audible argues, render the damages at issue "speculative."  Br. at 16.  Reiss alleges that Audible's distribution fees for both

competitive *and* exclusive distribution are supracompetitive.  *See* Compl. ¶ 113.  Thus,

regardless of her distribution election, Reiss allegedly suffered an overcharge injury.

Finally, the court "consider[s] 'the difficulty of identifying damages and apportioning

them among direct and indirect victims so as to avoid duplicative recoveries.'"  *Laydon v.*

*Coöperatieve Rabobank U.A.*, 55 F.4th 86, 99-100 (2d Cir. 2022) (quoting *Volvo N. Am.*

*Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988))*.*  Although Audible

maintains that any damages calculation for Reiss would be "exceptionally complex," Br. at

17, courts routinely decline to find that the complexity of damages calculations defeat

standing of an otherwise efficient enforcer.  *See. e.g.*, *DNAML*, 25 F. Supp. 3d at 431

(observing that plaintiff's "ability to show reasonably certain lost profits due to the conspiracy

may be challenging in the extreme," but holding that plaintiff was "entitled to a chance to

prove its case" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.118,

140 (2014))); *DDAVP*, 585 F.3d at 689 ("It may be difficult to account precisely for the likely

effects of generic competition [on drug pricing], but we have little doubt that those effects can

be sufficiently estimated and measured here.").  Therefore, the balance of the factors weighs

in favor of finding that Reiss has antitrust standing.

In arguing otherwise, Audible relies on inapposite cases involving direct competitors,

which are not present here, *see, e.g.*, *Gatt*, 711 F.3d 68, or indirect purchasers, *see, e.g.,*

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2006).  At oral argument,

Audible relied heavily on *Paycom* in particular.  Tr. at 61:13-62:18.  In *Paycom*, internet

merchant Paycom challenged, among other things, MasterCard's policy prohibiting member

banks from participating either as issuers or acquirers for other competing payment-card

networks.  467 F.3d at 287-88.  Paycom claimed that absent MasterCard's exclusionary

policy, "American Express and Discover would have had access to MasterCard banks," and

the "increased competition . . . would in turn have caused MasterCard to adopt policies more favorable to Paycom." *Id*. at 293. In holding that Paycom lacked antitrust standing, the court stressed that the competing payment-card network service providers were the entities directly harmed, and that "any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express." *Id.* at 294. Because of the presence of issuing and acquiring banks as intermediaries in the transactional chain, the causal link in *Paycom* is more attenuated than the one at issue here. Another court explained the attenuated causal chain in *Paycom* as follows: "[t]here, absent [MasterCard's policy], MasterCard member banks might have decided to act as issuers or acquirers for American Express and Discover; American Express and Discover might have increased their networks; MasterCard might have felt pressure to compete for merchants; and MasterCard might have charged some of its policies to be more merchant-friendly." *In re Credit Default Swaps Antitrust Litig*., No. 13-md-02476 (DLC), 2014 WL 4379112, at *8 (S.D.N.Y. Sept. 4, 2014). Here, in contrast, Reiss alleges that, absent Audible's exclusionary practices, rival distributors would have exerted downward pressure on Audible's fees, directly impacting Reiss's transactions with Audible. Notably, Audible cites no cases holding that a direct purchaser lacked antitrust standing, and in fact, Audible conceded at oral argument that it was not aware of any such case. Tr. at 70:25-71:5.

Therefore, the Court finds that Reiss has adequately pleaded that she has antitrust standing to bring her section 2 claims.

## CONCLUSION

For the aforementioned reasons, Audible's motion to dismiss the Complaint is

DENIED.  The Clerk of Court is respectfully directed to close the motion at Dkt. 64.

Dated: June 11, 2025
      New York, New York

                          SO ORDERED.

                          *Jennifer Rochon*
                          JENNIFER L. ROCHON
                          United States District Judge